_____
                                       )
STEVEN EMERSON, individually           )
and on behalf of all others            )          Civil Action No.
similarly situated; SHELDON            )          17-12137-PBS
GRONER; BARRY HEANY; and               )
MARK HANESS,                           )          Consolidated Cases:
                                       )          17-12168-PBS
                    Plaintiffs,        )          17-12474-PBS
                                       )
          v.                           )
                                       )
GENOCEA BIOSCIENCES, INC., WILLIAM     )
D. CLARK, and JONATHAN POOLE,          )
                                       )
                    Defendants.        )
_____)


**MEMORANDUM AND ORDER**

February 12, 2018

Saris, C.J.

**INTRODUCTION**

In this proposed class action, two competing lead
plaintiffs allege securities fraud by a biopharmaceutical
company. The plaintiffs assert that Genocea Biosciences, Inc.
("Genocea") and two officers artificially inflated the company's
stock price by reporting overly optimistic prospects for a
potential herpes treatment when, in reality, the company's
finances could not support successful regulatory approval of the
drug. When the company later reported that it was abandoning the

treatment, its share price fell precipitously. This prompted several plaintiffs to sue under the federal securities laws.

Now before the Court are two competing motions to appoint a lead plaintiff and class counsel. After hearing and consideration of the parties' submissions, the motion to appoint the Genocea Investor Group as lead plaintiff with Scott+Scott, Attorneys at Law, LLP, and Levi & Korsinsky, LLP, as co-lead class counsel and Block & Leviton, LLP, as liaison counsel (Docket No. 22) is **ALLOWED**. The competing lead-plaintiff motion of Sheldon Groner (Docket No. 16) is **DENIED**.

## FACTUAL BACKGROUND

Genocea is a biopharmaceutical company based in Cambridge, Massachusetts, that researches and develops vaccines and immunotherapies. Docket No. 1, ¶¶ 2-3, 18.[1] Between May and September 2017, Genocea's lead product candidate was a genital herpes immunotherapy product called GEN-003. Id. ¶¶ 1, 4, 19. The complaint alleges that the company and its officers made materially false or misleading statements, or failed to disclose information about GEN-003 -- primarily that Genocea's financial health was inadequate to support Phase 3 trials of the drug. Id.

---

[1]     This overview derives from the complaint in the lead case, Civil Action No. 17-12137-PBS. To the extent that the complaints in the two cases consolidated under the lead action vary, those variations are not material for present purposes.

¶ 5. As a result, the plaintiffs believe Genocea overstated the prospects of bringing GEN-003 to market. Id.

For instance, in May 2017, Genocea disclosed that the company expected GEN-003 to be ready for Phase 3 trials by the fourth quarter of 2017. Id. ¶ 20. In July and August 2017, the company made additional disclosures indicating positive results of Phase 2b trials and reiterating the company's expectation that GEN-003 would soon be ready for Phase 3 trials. Id. ¶¶ 21-22. However, after the markets closed on September 25, 2017, Genocea disclosed that it was halting spending on GEN-003, "exploring strategic alternatives for the drug," and cutting 40 percent of its workforce. Id. ¶¶ 6, 23. The next day, the company's share price fell $4.08, or 75 percent, to close at $1.25 per share. Id. ¶¶ 6, 24.

The drop in Genocea's share price prompted three putative class action lawsuits under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and under Rule 10b-5, 17 C.F.R. § 240.10b-5. See id. ¶¶ 1, 26-50. At a hearing in January 2018, the Court allowed a motion to consolidate the three cases. The Court took under advisement competing motions for the appointment of a lead plaintiff and class counsel. Those motions are now ripe for decision.

## LEGAL STANDARDS

### I.  General Framework for Appointing a Lead Plaintiff

The Private Securities Litigation Reform Act ("PSLRA") requires the Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). A class member may trigger a rebuttable presumption that she is the "most adequate plaintiff" by satisfying three criteria: (1) filing the complaint or making a timely motion to be lead plaintiff; (2) having the largest financial interest in the relief sought; and (3) otherwise satisfying Rule 23 of the Federal Rules of Civil Procedure. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Another class member may rebut this presumption "only upon proof" that the presumptive "most adequate plaintiff" either (1) "will not fairly and adequately protect the interests of the class," or (2) "is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

## II. **Aggregating Plaintiffs to Form Largest Financial Interest**

When analyzing who has the "largest financial interest in the relief sought," courts are divided on whether and when to allow groups of class members to aggregate their losses. See 7B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1806 (3d ed. 2017) (discussing various approaches

4

and noting that "many courts have emphasized that the decision .

. . must be made on a case-by-case basis"). See also Elizabeth

Chamblee Burch, Optimal Lead Plaintiffs, 64 Vand. L. Rev. 1109,

1137–39 (2011) (describing various approaches). On one end of

the spectrum, some courts have flatly refused to appoint groups

of unrelated persons as lead plaintiffs. See, e.g., In re

Donnkenny Inc. Sec. Litig., 171 F.R.D. 156, 157–58 (S.D.N.Y.

1997) (ruling that "aggregation of unrelated plaintiffs to serve

as lead plaintiffs defeats the purpose of choosing a lead

plaintiff" and undermines PSLRA purpose of "prevent[ing] lawyer-

driven litigation"). Others permit aggregation, taking note of

the PSLRA's direction to consider the "person or group of

persons" with the largest financial interest in the case. See,

e.g., In re Advanced Tissue Scis. Sec. Litig., 184 F.R.D. 346,

350 (S.D. Cal. 1998) (quoting 15 U.S.C. § 78u–

4(a)(3)(B)(iii)(I)). Still others fall somewhere in between. See

Burch, supra, at 1138 (discussing courts that have appointed

groups where no bad faith exists, where the group has

demonstrated cohesiveness, or where close-knit group members had

pre-litigation relationships).

In what appears to be the only Court of Appeals decision on

point, the Third Circuit has adopted a "rule of reason"

approach. See In re Cendant Corp. Litig., 264 F.3d 201, 266–67

(3d Cir. 2001). Noting that the PSLRA expressly permits a "group

of persons" to serve as lead plaintiff, the Third Circuit "disagree[d] with those courts that have held that the statute invariably precludes a group of 'unrelated individuals' from serving as a lead plaintiff." Id. at 266 (citing 15 U.S.C. §§ 78u-4(a)(3)(B)(iii)(I) and 78u-4(a)(3)(B)(i)). Instead, the Third Circuit held that the nature and extent of the group members' prior relationship, if any, as well as the size of the group, should be taken into account as factors in an overall determination of whether the group can "fairly and adequately protect the interests of the class." Id. at 266-67.

The courts in this district have generally permitted aggregation of unrelated plaintiffs after examining various relevant factors to determine whether the group can fairly and adequately protect the interests of the class. See, e.g., Arkansas Teacher Ret. Sys. v. Insulet Corp., 177 F. Supp. 3d 618, 623 (D. Mass. 2016) (discussing how court should consider "any relevant factors" in group-lead-plaintiff analysis); In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d 39, 44 (D. Mass. 2001) ("[A] Court should not blindly aggregate the losses of unrelated plaintiffs to confer lead plaintiff status on a group without considering whether the grouping is sufficiently coherent to control the litigation."); Howard Gunty Profit Sharing Plan v. CareMatrix Corp., 354 F. Supp. 2d 18, 24 (D. Mass. 2000) ("It is not necessary that proposed lead plaintiffs

6

have a pre-litigation relationship, but rather that they be able to operate in concert and manage the litigation and the lawyers, which is accomplished most successfully by a single plaintiff or small group of plaintiffs."). Relevant factors in this body of case law have included: (1) pre-existing relationships between the members, (2) the involvement of group members in litigation thus far, (3) a demonstration of how group members will cooperate and function collectively, (4) the establishment of communication mechanisms between members and proposed lead counsel, (5) the sophistication of group members, (6) whether members chose outside counsel and not vice versa, and (7) any other relevant factors. See Arkansas Teacher Ret. Sys., 177 F. Supp. at 623; Varghese v. China Shenghuo Pharm. Holdings, Inc., 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008); In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d at 44; In re MicroStrategy Inc. Sec. Litig., 110 F. Supp. 2d 427, 435 (E.D. Va. 2000).

## DISCUSSION

The two competing lead plaintiffs in this case are an individual named Sheldon Groner and a group of five unrelated investors referred to as the Genocea Investor Group ("GIG"). Groner and GIG join issue over two of the three "most adequate plaintiff" criteria: the timeliness of GIG's motion to become lead plaintiff, and who has the largest financial interest in the litigation.

## I.   Timeliness of GIG's Motion

Groner first argues that GIG's motion to be lead plaintiff was untimely. According to Groner, because the motion was filed at 6:04 p.m. on January 2, 2018, it was four minutes late under the local filing deadline of 6 p.m. and must be deemed filed the next day. See L.R., D. Mass. 5.4(d). Because January 2, 2018, happened to be the final day in the PSLRA's 60-day window for filing lead-plaintiff motions, Groner argues that GIG's motion was untimely. See 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). GIG acknowledges its filing was a wee bit tardy, but argues that such a trivial delinquency should not disqualify its motion.

Groner is correct that the PSLRA requires lead-plaintiff motions to be filed within 60 days of the publication of notice of the complaint. See 15 U.S.C. § 78u-4(a)(3)(A)(i)(II). He is also correct that the local rules require documents to be filed "prior to 6:00 p.m. to be considered timely filed that day." L.R., D. Mass. 5.4(d).

That said, the Court denies the request to disqualify GIG's motion over a de minimis infraction of four minutes. Groner cites no case law to support his contention that the PSLRA's 60-day window is jurisdictional in nature. Although courts typically "adhere strictly" to the PSLRA's 60-day filing window, Reitan v. China Mobile Games & Entm't Grp., Ltd., 68 F. Supp. 3d 390, 397 (S.D.N.Y. 2014), the 6 p.m. deadline under the local

rules is not sacrosanct. See Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994) ("District courts enjoy broad latitude in administering local rules."). Because GIG's motion was filed on the sixtieth day of the PSLRA's 60-day window, the motion did not turn into a pumpkin at the stroke of 6 p.m. Thus, notwithstanding the four-minute lag under the local rule, the Court will consider the motion.

## II.  Aggregation of Plaintiffs' Losses

The parties agree that the appropriate metric for calculating each side's financial interest comprises four figures: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and, most importantly, (4) the approximate losses suffered during the class period. See Arkansas Teacher Ret. Sys., 177 F. Supp. 3d at 622 (citing In re Olsten Corp. Sec. Litig., 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998)).

The parties also agree, although they quibble about the exact figures, that if the GIG members are permitted to aggregate their claims, they have the largest financial interest in the case, exceeding Groner's totals in each of the four categories just described. See Docket Nos. 32 at 9; 33 at 9-16; 34 at 4-5. The parties similarly do not dispute that if

9

aggregation is not permitted, Groner sweeps all four categories

and therefore has the largest individual loss under the same

metric. See Docket Nos. 32 at 9; 34 at 4-5.

Thus, the critical question is whether aggregation is

appropriate in this case -- in other words, whether GIG is up to

the task of representing the interests of all plaintiffs.[2] Groner

suggests not, arguing that GIG is a "hodgepodge of five

unrelated investors . . . assembled at the eleventh hour by at

least three different law firms." Because such a group lacks

cohesion and is not bound by any pre-existing relationships,

Groner argues, it will inevitably end up controlled by lawyers

and therefore undermine an important purpose of the PSLRA. He

pointedly adds that GIG's late-filed motion is symptomatic of

the group's inability to work together. GIG counters that there

is no requirement that a lead-plaintiff group have a pre-

existing relationship, and that GIG's five members have agreed

---

[2]    Groner also assails the accuracy and adequacy of GIG's proffered
evidence of its financial interest in the case and, as an alternative
argument, seeks further discovery related to GIG's composition. These
arguments are unavailing because Groner misinterprets the relatively
low burden of proof borne by a party seeking appointment as "most
adequate plaintiff." See In re Cendant Corp. Litig., 264 F.3d 201, 263
(3d Cir. 2001) (confining "initial inquiry" regarding financial
interest and satisfaction of Rule 23 to "a prima facie showing of
typicality and adequacy"); Weltz v. Lee, 199 F.R.D. 129, 133 (S.D.N.Y.
2001) (noting that investor seeking appointment as lead plaintiff need
only make "preliminary showing" that it satisfies Rule 23's typicality
and adequacy requirements).

to communication and decision-making protocols that will allow the group to effectively control the litigation.

Despite the four-minute late filing on January 2, after a long holiday weekend, GIG has satisfied the Court that it will be able to adequately represent the plaintiffs' interests in this case. True, GIG's members do not assert any pre-litigation relationship. However, "[i]t is not necessary that proposed lead plaintiffs have a pre-litigation relationship." Howard Gunty Profit Sharing Plan, 354 F. Supp. 2d at 24. Instead, other factors carry the day for GIG.

The GIG members have submitted a joint declaration discussing, albeit not in tremendous detail, their plan to "exercise joint decision-making and work together to actively monitor the activities of counsel." Docket No. 23-5, ¶ 13. The group reports that it has agreed "to regularly review and discuss case filings with counsel through joint conference calls, as well as other measures." Id. GIG also asserts that it has "implemented communication procedures to enable [its members] to confer via phone and/or email on short notice to ensure [the group] is able to make timely decisions." Id. ¶ 14. Courts have found communication and decision-making plans like these to be persuasive evidence of group cohesion. See, e.g., Arkansas Teacher Ret. Sys., 177 F. Supp. 3d at 623 (weighing group members' "sworn declaration explaining how and why they

intend to work together," as well as "discuss[ion of] how duties
will be shared among the [group members] and how they will
communicate with each other and with lead counsel"); In re
Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d at 45 (noting
that "relatively detailed litigation strategy" and agreement to
regular conference calls demonstrated ability to work together).
Cf. Varghese, 589 F. Supp. 2d at 393 (rejecting proposed group
that "fail[ed] to provide the Court with any evidence that its
members have had any prior pertinent relationships or
cooperative efforts, or that they will act collectively and
separately from their lawyers").

The GIG members also appear to be sufficiently
sophisticated to direct this litigation and prevent it from
becoming lawyer-driven. As represented by counsel at the
hearing, the members include two individuals with master's
degrees, a professor at Temple University, a businessman, and an
individual with a background in accounting and a degree from
Suffolk University. See Khunt v. Alibaba Grp. Holding Ltd., 102
F. Supp. 3d 523, 533 (S.D.N.Y. 2015) (weighing fact that
"plaintiffs do appear to be quite sophisticated," although
ultimately not approving group).

Additionally, courts have frequently approved lead
plaintiff groups of a size similar to GIG. See, e.g., Barnet v.
Elan Corp., 236 F.R.D. 158, 162 (S.D.N.Y. 2005) (group of six

"not too unwieldy a number to effectively manage the litigation"); Weltz v. Lee, 199 F.R.D. 129, 133 (S.D.N.Y. 2001) (group of seven "does not present a group so cumbersome as to deliver the control of the litigation into the hands of the lawyers"); In re Advanced Tissue Sciences Sec. Litig., 184 F.R.D. at 352-53 (approving six-member lead plaintiff group). See also In re Cendant Corp. Litig., 264 F.3d at 267 (endorsing position of Securities and Exchange Commission "that courts should generally presume that groups with more than five members are too large to work effectively").

Of course, Groner highlights a number of cases where aggregation was disallowed for a variety of reasons. See, e.g., In re Petrobras Sec. Litig., 104 F. Supp. 3d 618, 622-23 (S.D.N.Y. 2015) (rejecting two proposed lead-plaintiff groups that were "wholly artificial groupings" where one group "had little inclination to take a firm hand in their dealings with counsel" and the other exhibited a "lack of advance planning regarding how the litigation would be managed" and "failed to show that it would act with the cohesion necessary to prosecute the case effectively"); Khunt, 102 F. Supp. 3d at 534 (rejecting lead-plaintiff group, despite sophistication, because group appeared to be "cobbled together" by lawyers and likely to create "case control problems and rival disagreements, resulting in delay and increased expense").

13

Far from being determinative, however, these cases simply illustrate the principle that the appointment of a lead-plaintiff group should be considered on a case-by-case basis. See In re Cendant Corp. Litig., 264 F.3d at 267 (rejecting "hard-and-fast rule" in favor of "a kind of 'rule of reason'"); Wright & Miller, supra, § 1806 (collecting cases that have embraced a "case-by-case" approach). Indeed, even the leading cases offered by Groner apply this type of flexible, multi-factor approach. See In re Petrobras Sec. Litig., 104 F. Supp. 3d at 622; Khunt, 102 F. Supp. 3d at 533.

Given the communication and decision-making plans described in GIG's joint declaration, and the presentation by counsel concerning the sophistication of the GIG members, the Court is satisfied that the five-person GIG will adequately represent the plaintiffs' interests and will not cede control of the litigation to the attorneys. Accordingly, the Court will permit the members of GIG to aggregate their losses for purposes of the "most adequate plaintiff" analysis. It bears mentioning that this decision is without prejudice, and the Court "reserves the right to modify this lead plaintiff structure in the event that litigation is stalled, expenses become unnecessarily duplicative or wasteful, or the structure becomes otherwise unmanageable." In re Gentiva Sec. Litig., 281 F.R.D. 108, 117 (E.D.N.Y. 2012).

## III. **Remaining Issues**

Groner does not seriously dispute the remaining components of the "most adequate plaintiff" formula, and the Court addresses them only briefly.

To begin, GIG must demonstrate that it otherwise satisfies the demands of Rule 23 -- in particular the typicality and adequacy prongs. In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d at 45-46. "The plaintiffs' burden in proving typicality requires that the named plaintiffs' claims arise from the 'same events or course of conduct' and involve the same legal theory as do the claims of the rest of the class." Id. at 46 (quoting In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1532 (D. Mass. 1991)). GIG asserts that its claims are typical of the other class claims because they all arise from the purchase of Genocea securities at a point in time when, it is alleged, share prices were artificially inflated due to material false and misleading statements by the company and its officers. Groner does not argue this point. Accordingly, the Court finds GIG's claims to be typical of the class.

"To meet the adequacy requirement, plaintiffs must demonstrate that they have common interests and an absence of conflict with the class members and that the plaintiffs' attorneys are qualified, experienced and vigorously able to conduct the litigation." Id. GIG asserts that its common

interest arises from the fact that its members suffered harm
from the same alleged violations of the securities laws as the
other class members, and that there is no suggestion of any
conflict with class members or inadequacy of counsel. As above,
Groner does not dispute these points. Thus, the Court finds GIG
has met the adequacy requirement.

Consequently, GIG has triggered the presumption that it is
the "most adequate plaintiff" for this litigation. This
presumption may be rebutted "only upon proof" that GIG either
(1) "will not fairly and adequately protect the interests of the
class," or (2) "is subject to unique defenses that render [GIG]
incapable of adequately representing the class." 15 U.S.C. §
78u-4(a)(3)(B)(iii)(II).

Groner does not explicitly attempt to rebut the "most
adequate plaintiff" presumption, although one could interpret
his attacks on GIG's cohesion to imply that GIG will not fairly
and adequately represent the interests of the class. To the
extent that is the case, the Court has already rejected that
argument for the reasons given above. Accordingly, the Court
appoints GIG as the lead plaintiff.

Finally, "[t]he PSLRA provides that the lead plaintiff
shall select class counsel subject to the court's approval."
Arkansas Teacher Ret. Sys., 177 F. Supp. 3d at 626 (citing 15
U.S.C. § 78u-4(a)(3)(B)(v)). "While the Court should not be a

rubber stamp," the lead plaintiff's choice is entitled to "some
weight." In re Lernout & Hauspie Sec. Litig., 138 F. Supp. 2d at
46–47. Here, GIG has selected Scott+Scott and Levi & Korsinsky
as co-lead counsel, with Block & Leviton as liaison counsel. All
three firms have substantial experience in litigating securities
class actions. See Docket Nos. 23-6, 23-7, 23-8.

Although Groner argues that the presence of three law firms
is further evidence that GIG is a lawyer-driven group, he does
not question the firms' credentials. Groner has a point that GIG
may have too many cooks in the kitchen. However, this is a big
case, and the plethora of attorneys will not increase the net
percentage of attorneys' fees, which are typically paid under a
common fund theory. See In re Fidelity/Micron Sec. Litig., 167
F.3d 735, 738 & n.3 (1st Cir. 1999) (quoting 15 U.S.C. § 78u-
4(a)(6)) (noting how class-action attorneys must establish that
fees are "reasonable and necessary to the creation and
maintenance" of common fund and observing that PSLRA "take[s] a
similar tack"). Under such a framework, the Court will have
little difficulty reducing excessive fees and expenses.
Accordingly, the Court approves GIG's selection of counsel.

## ORDER

GIG's motion to be appointed lead plaintiff and to approve
counsel (Docket No. 22) is **ALLOWED**. Groner's parallel motion
(Docket No. 16) is **DENIED**.

/s/ PATTI B. SARIS
_____
Patti B. Saris
Chief United States District Judge