# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEVEN EMERSON, individually and on behalf of all others similarly situated, SHELDON GRONER, BARRY HEANY, MARK HANESS, SCOTT HARTMANN, SATYA KUNAPULI, LIRIO FIOCCHI, RAUL ZAMUDIO, and OMER YUKSEL,[1]<br><br>        Plaintiffs,<br><br>    v.<br><br>GENOCEA BIOSCIENCES, INC., WILLIAM D. CLARK, JONATHAN POOLE, and SETH HETHERINGTON,[2]<br><br>        Defendants. | Civil Action No. 1:17-cv-12137<br><br>Consolidated Cases:<br>No. 17-cv-12168<br>No. 17-cv-12474<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

---

[1]     Scott Hartmann, Satya Kunapuli, Lirio Fiocchi, Raul Zamudio, and Omer Yuksel were named Lead Plaintiffs in this Court's Memorandum and Order entered February 12, 2018 (ECF No. 42).

[2]     Seth Hetherington is being named as an additional Defendant.

Lead Plaintiffs Scott Hartmann, Satya Kunapuli, Lirio Fiocchi, Raul Zamudio, and Omer Yuksel ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, information provided by confidential witnesses, a review of Genocea Biosciences, Inc.'s ("Genocea" or "the Company") press releases and Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, and other publicly disclosed reports and information about the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE AND SUMMARY OF THE ACTION</u>

1.      This is a securities class action on behalf of Plaintiffs and all other persons or entities, except for Defendants, who purchased or otherwise acquired Genocea shares between March 31, 2016 and September 25, 2017, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.      Genocea is a clinical-stage biopharmaceutical company that investigates, develops, and seeks to bring to market T-cell vaccines to prevent and treat infectious disease. Genocea went public in February 2014 and its common stock has traded on NASDAQ at all relevant times. To date, Genocea has yet to succeed in obtaining final FDA approval to market any of its products to the public, and had accumulated deficits of more than $253 million as of

the end of the Class Period.  In Genocea's Second Quarter 2017 Form 10-Q, Genocea warned that its continuing operating losses raised substantial doubt about its ability to operate as a going concern, and that its ability to do so was dependent on its ability to obtain the necessary capital from outside sources.

3.     Throughout the Class Period, Genocea's only product candidate in active clinical development was GEN-003, an investigational protein vaccine to treat patients with recurrent outbreaks of genital herpes simplex virus (HSV-2) infection.  While there were already products on the market to treat herpes, including acyclovir, either through taking a daily pill to reduce the danger of transmission through sex as well as outbreaks of lesions, or to take intermittently to reduce the severity of outbreaks when they occurred, Defendants, through GEN-003, were proposing to treat herpes with a vaccine that could be administered every six to twelve months. If successful, GEN-003 would be the first time that a vaccine had ever been administered as therapy to infected patients to treat a chronic disease by strengthening their immune systems. Because of the novelty of this therapeutic approach and the enormous cost of developing a new drug for commercial use, Defendants needed to demonstrate strong and consistent results demonstrating its efficacy and safety.  However, as Defendants well knew, the clinical tests fell well short of this extremely high bar.  This resulted from the inherent variability in herpes outbreaks, both patient to patient and from the intermittent nature of the occurrences suffered by individual patients, weaknesses in patient compliance with testing protocols during the clinical studies, and the small numbers of participants spread across the experimental dosing groups and the placebo group for the study trials.

4.     Through a series of three phased clinical trials (Phase 1/2a, Phase 2, and Phase 2b), in collaboration with independent clinical investigators, Genocea tested different doses of its

experimental antigens alone and in combination with an adjuvant, for immunogenicity, safety, and effectiveness in reducing viral shedding (which causes transmission of herpes during sex even when an infected partner is asymptomatic) and the frequency and severity of genital lesions.

5.      During each clinical testing phase, test subjects were randomly assigned to different dosing groups or to a group administered a placebo, and were given three injections staggered over three 21-day periods.  The levels of virus (as well as lesions) were tested in each subject before any of the injections were administered in order to develop a baseline, and then interim testing was performed within 28 days after the third injection.  To gather information on viral shedding, patients were asked to submit swabs of their genital areas for measurement of the virus and to "self-report" on forms their incidence of genital lesions and any comments relating to their swabbing.  As reported by former Genocea employees who provided information on a confidential basis (the "confidential witnesses," or "CW's"), test participants reported failing to follow the test protocol when swabbing their genitals, failed to accurately "self-report" the incidence of their genital lesions and, at times, took acyclovir, when they experienced extreme distress from their lesions.

6.      For determining the efficacy of GEN-003, the statistical significance of both reductions in viral shedding and the number and severity of lesions was measured against the pre-dosing baseline, and also against a placebo control group within 28 days of the third injection.  However, for Phase 2, the interim post-dosing tests for the reduction in lesions showed that GEN-003 was not more effective than the placebo.  When performing follow-up testing at 6 months and 12 months for the Phase 2 study, Genocea did not monitor or compare GEN-003 against the placebo group.  For the Phase 2b study, as it reported on the NIH government web-

site, Genocea used the placebo group as a control for the 28-day, 6-month and 12-month testing to test for the statistical significance of reductions in the viral shedding rate. Defendants, however, only selectively publicly reported positive results, or dismissed as unreliable those study results that failed to support their claims. In particular, for the Phase 2b study, Defendants touted the "consistency" of the 6-month and 12-month data showing a reduction in lesions, while concealing the 6-month viral shedding test results, and downplaying the 12-month data that they did report for viral shedding which showed that GEN-003 was no more effective than a placebo in reducing viral shedding – the critical marker for demonstrating that the drug had sufficient efficacy to warrant the enormous expense of the Phase 3 testing needed to gain FDA approval to market the drug to the public.

7.      As Defendants cherry-picked the disclosure of its test data, and downplayed negative test results, Defendants hyped GEN-003 as "revolutionary" and a "cornerstone therapy" having the critical "consistency" of test results needed for commercialization, particularly given the novelty of the vaccine, inherent variability of patient outbreaks, and the relatively small numbers of participants in the early studies. Defendants also touted its multi-billion dollar "blockbuster" market opportunity as indicated by the Company's market surveys of patient interest in an effective vaccine, as well as feedback from potential business partners, even after Defendant William D. Clark admitted, internally, the lack of interest by major pharmaceutical companies in developing the GEN-003 vaccine.

8.      On September 25, 2017, after the market closed, Genocea shocked the market when it disclosed that it was immediately halting spending on and testing of GEN-003, and was exploring "strategic alternatives" for the drug. The Company also then announced that it was cutting 40% of its workforce.

9.      On this news, the Company's share price fell $4.08, or 76.5%, to close at $1.25 on September 26, 2017.

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Genocea's principal executive offices are located within this District.

14.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiff Scott Hartmann ("Hartmann") is a citizen of Massachusetts.  As set forth in the Certification earlier filed in this action, Plaintiff Hartmann acquired Genocea shares during the Class Period, at times that their prices were artificially inflated as a result of Defendants' false and misleading statements and omissions about GEN-003, and was damaged when the truth about its prospects and problems were revealed.

16.     Plaintiff Satya Kunapuli ("Kunapuli") is a citizen of Pennsylvania.  As set forth in the Certification earlier filed in this action, Plaintiff Kunapuli acquired Genocea shares during the Class Period, at times that their prices were artificially inflated as a result of Defendants' false and misleading statements and omissions about GEN-003, and was damaged when the truth about its prospects and problems were revealed.

17.     Plaintiff Lirio Fiocchi ("Fiocchi") is a citizen of New Jersey.  As set forth in the Certification earlier filed in this action, Plaintiff Fiocchi acquired Genocea shares during the Class Period, at times that their prices were artificially inflated as a result of Defendants' false and misleading statements and omissions about GEN-003, and was damaged when the truth about its prospects and problems were revealed.

18.     Plaintiff Raul Zamudio ("Zamudio") is a citizen of Texas.  As set forth in the Certification earlier filed in this action, Plaintiff Zamudio acquired Genocea shares during the Class Period, at times that their prices were artificially inflated as a result of Defendants' false and misleading statements and omissions about GEN-003, and was damaged when the truth about its prospects and problems were revealed.

19.     Plaintiff Omer Yuksel ("Yuksel") is a citizen of New Jersey.  As set forth in the Certification earlier filed in this action, Plaintiff Yuksel acquired Genocea shares during the Class Period, at times that their prices were artificially inflated as a result of Defendants' false and misleading statements and omissions about GEN-003, and was damaged when the truth about its prospects and problems were revealed.

20.     Defendant Genocea is incorporated in Delaware, with principal executive offices located at 100 Acorn Park Drive, Cambridge, Massachusetts 02140.  Genocea shares trade on the NASDAQ under the ticker symbol "GNCA."

21.     Defendant William D. ("Chip") Clark ("Clark") has served at all relevant times as the Company's President and Chief Executive Officer ("CEO").  Clark knowingly or recklessly made materially false and misleading statements about GEN-003's test results and prospects in SEC filings he signed, and in press releases and analyst calls throughout the Class Period.

22.     Defendant Jonathan Poole ("Poole") has served at all relevant times as the Company's Chief Financial Officer ("CFO").  Poole knowingly or recklessly made materially false and misleading statements about GEN-003's test results and prospects in SEC filings he signed, and in press releases and analyst calls during the Class Period.  Poole also engaged in insider trading when selling thousands of shares of his Genocea stock.

23.     Defendant Seth Hetherington ("Hetherington") has served at all relevant times as the Company's Chief Medical Officer ("CMO").  Hetherington knowingly or recklessly made materially false and misleading statements about GEN-003's test results and prospects in analyst calls throughout the Class Period.

24.     The Defendants referenced above in ¶¶21-23 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

25.     Genocea is a clinical-stage biopharmaceutical company that develops T-cell-directed vaccines and immunotherapies.  The Company went public in February 2014, and has yet to successfully develop a drug for commercial use.  As of the end of the Class Period, it had accumulated a $253 million deficit, and had warned that without additional outside funding it might not be able to continue as a going concern.  In addition, for all relevant times, Genocea was under enormous financial pressure by its private equity investors and lenders, including

Hercules Technology Growth Capital ("Hercules"), to demonstrate that it could earn sales revenues in the foreseeable future, and particularly that GEN-003 was a viable candidate for commercialization.

26.     Using its ATLAS™ proprietary technology platform, Genocea has sought to identify and develop medicines that imitate the body's protective immune responses to address prevalent diseases where substantial commercial opportunities existed.

27.     Throughout the Class Period, GEN-003, a proposed vaccine to treat genital herpes (HSV-2), was Genocea's only product candidate in active clinical development.  In its public reports, Genocea described GEN-003 as a "first-in-class" T-cell-directed immunotherapy designed to elicit both a T-cell and B-cell (antibody) immune response.  GEN-003 includes two proprietary proteins, the antigens ICP4 and gD2, along with an adjuvant, Matrix-M2™, which Genocea licensed from Novavax, Inc.

28.     With GEN-003, Genocea was attempting to test, develop, and commercialize the first therapeutic vaccine for the treatment of any chronic disease.  All other vaccines are prophylactic, meaning that the vaccine is administered to those who have yet to contract the disease.  In seeking to develop an immunotherapy vaccine, Genocea was taking a wholly novel approach – to "tweak" a patient's immune system to eliminate or reduce the transmissibility or effects of the disease in those who were already infected.

29.     CW1, Genocea's former Director of Translated Medicine, was the person responsible for pre-clinical research for GEN-003 until January 2015, when CW1 became a consultant to the Company.  CW1, when employed at Genocea, reported directly to Jessica Flechtner, the Company's Chief Scientific Officer at all relevant times, who reported directly to the CEO, Defendant Clark.  CW1 explained that the Company, in pursuing this novel application

of immunotherapy, had not acquired a core understanding of the function of the immune system in relation to genital herpes, nor did it acquire the foundational understanding of the transmission of HSV-2 or the interplay between viral shedding, lesions, and infectivity.  Thus, according to CW1, all that Genocea had in GEN-003 was statistical results that showed a "small signal" for the reduction of viral shedding and lesions, which was not strong enough to satisfy the extremely high bar associated with the commercialization of an immunotherapy vaccine.  CW1 drew these conclusions from CW1's own long history of work in vaccine development with a large pharmaceutical company.

A.      **The HSV-2 Virus and Its Inherent Study Challenges**

30.      HSV-2 is an incurable and chronic sexually transmitted disease that affects over 500 million people worldwide.  Currently, and at the time of testing GEN-003, the only treatment for the disease was with orally taken drugs that could either be taken daily to reduce the incidence and severity of herpes outbreaks, or at the time of patient outbreaks to lessen their effects.  As CW1 explained, acyclovir, then widely marketed to the public, was extremely effective in minimizing outbreaks and was "dirt cheap."  According to Defendants, Genocea's market surveys showed that there was widespread dissatisfaction by patients and their doctors with existing treatment alternatives, and a "market opportunity" of as much as $2 billion for an effective vaccine.  As CW1 explained, however, none of the test results for GEN-003 qualified it as a treatment that cured the disease or eliminated the risk of its sexual transmission, which is what was likely required to generate sufficient interest on the part of potential investors for commercialization.

31.      After the initial infection, the herpes virus remains latent in the spinal ganglion and is periodically reactivated, travelling to the patient's mucus membranes and skin in a process called "viral shedding."  The disease may be sexually transmitted during viral shedding even

though the patient appears asymptomatic, *i.e.*, without pain or lesions.   The periodic disease reactivation causing viral shedding is specific and highly variable in individual patients and is necessary for the development of genital lesions.

32.   As CW1 explained, in testing a vaccine for HSV-2, the high variability of patients' viral shedding experiences creates inherent challenges for controlling for the wide differences of shedding outbreak episodes from patient to patient, and for the varied episodes of outbreaks for individual patients.   As CW1 explained, intrinsic to testing of both placebo and active ingredient groups was "what the viral shedding was doing on its own without treatment." Defendant Clark, in responding to an analyst's question at a March 2016 conference call on Phase 2 trial results about the volatility in reported viral shedding test results, similarly explained that viral shedding was an "episodic event, it's sporadic, it's not sustained," and that many episodes were missed in the test results because of their short duration.   As Clark explained, because of this inherent variability, knowing the "totality of the picture" and "consistency" of test results from trial-to-trial was what was important in demonstrating GEN-003's anti-viral effect, and thus was "material" to investors in determining the prospects of GEN-003 for success.

33.   Despite its limitations, the measurement of reductions in viral shedding rates was the accepted scientific outcome for establishing efficacy of treatments for HSV-2.   As various statisticians and scientists working on GEN-003 described in a March 2017 paper published in the JOURNAL OF INFECTIOUS DISEASES, "[V]iral shedding was used as the main efficacy outcome because it is an objective measure of mucosal HSV replication, its measurement has been previously used to demonstrate differences in efficacy between doses of antiviral therapies and it is the primary mode for transmission."   For its Phase 2b study, which tested a version of GEN-003 that had been reformulated so that it could be manufactured on the scale needed for the

much larger Phase 3 tests to obtain FDA marketing approval, the reduction in viral shedding rates was the primary outcome measure.

**B.     The Study Results for Patient Self-Reports and Swabbing Were Weak and Unreliable**

34.     As CW1 explained, patients were not supposed to take acyclovir during the course of trials.  However, when study participants got lesions and were in agony, there were instances when they did take that drug.

35.     CW2 also described problems in the GEN-003 trials in obtaining compliance by study participants with the GEN-003 testing protocols.  CW2 is a former Genocea clinical trial associate employed by Genocea from mid-2012 through the end of the Class Period.  CW2 worked on the GEN-003 trials, including collecting the forms study participants prepared, which contained self-reports of their lesions and periodically explained deviations from the studies' swabbing protocols by the participants.  CW2 worked closely with the scientists who ran the assays on the swabs used to test and measure viral shedding, including Bruce Piquani, Meghan Hart, and Maria Muraca.  CW2 also learned of non-compliant study participants swabbing in CW2's discussions with the clinical research staff.  In addition, the feedback CW2 received from clinical scientists, who were working with the data on a daily basis, was that the test data results were not what they "should have been seeing" in terms of lowering viral shedding.  Thus, *e.g.*, Ms. Muraca at times commented that the data was "not strong enough" and Mr. Piquani "said this all the time."

36.     CW2 explained that patients were supposed to swab their genital areas twice per day, at particular times, for 28 days before receiving the vaccine or placebo, and then again twice a day later in the trial and at ranges of six months and 12 months.  The patients would then submit the swabs for testing for evidence of viral shedding to the clinical scientists, who sent

them to CW2 on a daily basis.  The patients also filled out forms, sent to CW2, which reported their observations of whether they had one or more lesions at these same points in time.

37.     CW2 explained that patients, on the forms she collected, at times reported swabbing their lesions instead of genital areas as instructed in the protocol.  In other instances, patients submitted two sets of swabs, without distinguishing what area had been swabbed.  CW2 learned about these non-compliant practices from clinical study coordinators, as well as from reading patients' forms.  CW3, a Senior Clinical Trial Associate in the GEN-003 program from May 2016 to February 2017 whose responsibilities included reaching out to the site research teams about compliance with the testing protocols, confirmed that there were issues with the patients not following the swabbing protocol.  According to CW3, "patients weren't swabbing every day like they needed to."  CW3 noted that there were a few clinical sites where this problem occurred, and that the topic was discussed at department meetings.

38.     CW2 also explained that the study included a wide variation of types of patients, including ordinary "hard-working" patients, but also "junkies," who did not have a vested interest in keeping and submitting accurate records of their lesions, and that concerns about the reliability of patient self-reports were discussed with the clinical teams.

39.     According to CW2, this witness entered the data from patient forms, including the instances of non-compliance with testing protocols, into the Company's Freezerworks information system.  She also entered into Freezerworks the information she learned about instances of participant non-compliance with the viral shedding protocol from clinical staff. Upon receipt, CW2 provided the swabs to the scientists who ran the assays to develop the viral shedding results.  The scientists prepared "data packages," which were reviewed by quality assurance and the managers of the assay group.  Originally, the Core LMS system was used to

capture, analyze and manage the GEN-003 study data, and for later periods, the data was entered into the Freezerworks system for that purpose.

40.     CW2 explained that it was CW2's understanding, based upon information CW2 learned in clinical department meetings CW2 attended, that there was a regular reporting schedule for the clinical data, including the preparation of quarterly reports furnished to senior executives including Hetherington and Clark.

## C.     The GEN-003 Phased Studies

### The Phase 1/2a Trials

41.     The first study of GEN-003 was designed collaboratively by investigators at Genocea and the University of Washington.  The study was a double-blind, placebo-controlled, dose escalation clinical trial for the purpose of evaluating the safety and immunogenicity of GEN-003.  The study involved 134 participants who were spread across three dose cohorts and given, alternatively, 10, 30, or 100 micrograms ("μg") of GEN-003.  The secondary objective of the studies was to test for the reduction of HSV viral shedding from GEN-003, by testing the shedding rates before, versus after, the GEN-003 treatments.

42.     Each patient was given three injections at 21-day intervals and was tested for changes in the level of viral shedding during the four weeks following the third dose, versus pre-dosing levels, the patients' "baseline."   At 6 months following the injections, the study participants were again tested and the results compared with the participants' pre-dosing viral shedding levels.

43.     The study indicated that GEN-003 was safe and well tolerated, and that the 30-μg adjuvanted dose reduced viral shedding by 52%, as tested for the 4 weeks after the final dosing, and remained lower at the testing performed 6 months later.  The 30-μg group also showed a

decrease in lesion rates after immunization and at 6- and 12-month testing.  While the 100-μg dose resulted in lower viral shedding, the rate of reduction was less than the 30-μg group.

44.    The Phase 1/2a trial results were described in a March 15, 2017 article drafted by scientists involved in the study and published in the JOURNAL OF INFECTIOUS DISEASES.  Among other things, the article reported that the University of Washington discovered that the statistical method they had used, the "standard Poisson regression method," included a "type 1" error of up to 28%, meaning that when the treatment had statistically no impact on the outcome rate, there was still an approximate 1:4 chance that a statistically significant p-value (or statistical confidence level) of less than 5% would result from the study.  The error in the original testing method was attributed to the failure to account for the two types of variances in viral shedding: one related to patient-to-patient differences; and the other to changes in viral shedding rates by the individual patient.

45.    As Dr. Josh Bloom, a scientist with the American Council on Science and Health, a pro-science consumer advocacy organization, commented in a blog on March 30, 2017, upon reading the article about the study in the JOURNAL OF INFECTIOUS DISEASES, "[T]he good news is that infected patients did respond to the vaccine.  The not-so-good news is that the response was not as impressive as patients would hope."

**The Phase 2 Trial**

46.    In January 2015, Genocea announced that it had completed enrollment for a Phase 2 dose optimization clinical trial for GEN-003.  The primary objective of this trial was to test various combinations and doses of protein and adjuvant to identify the most effective dosing.

47.    The Phase 2 study enrolled 310 subjects that were randomized into six dosing groups and a seventh placebo group, with about 45 participants in each group.  The first objective, or "primary endpoint," was to measure viral shedding in the 4 weeks post-dosing, and

at 6 months and 12 months post-dosing.  The second endpoint was to test for changes in the occurrence of genital lesions.  The standard Poisson method was again used to test for statistical significance of the results.

48.     Again, each subject was given a series of three injections and was tested following the third dose.  Tests of viral shedding during that 4-week period showed a significant reduction in the viral shedding rate for the 30-µg and 60-µg doses, with a 4% reduction in viral shedding for the placebo control group.

49.     The rate in reduction of genital lesions, however, was reduced by 62% for those *in the placebo control group*, more than the lesion reduction rate for the 30-µg dose participants, and about the same as the reductions for those taking the 60-µg dose.

50.     In reporting the post-dosing test results, and by its slide presentation to analysts, Genocea announced in May 2015 that the "Reduction in Viral Shedding Drives Confidence in Achieving Attractive Product Profile," and that the study found that the best combination dose was 60-µg per protein/75-µg of adjuvant.   In that same presentation, however, Genocea did acknowledge that the post-dosing lesion rate results were problematical: the "Placebo effect confounds interpretation of patient-reported lesion rates."

51.     Nonetheless, Genocea failed to monitor and test the results of GEN-003, versus the placebo group, over the next 6 to 12 months to determine whether any of the test results it obtained were confirmed as robust as measured against a placebo control.

52.     In October 2015, Genocea announced that the GEN-003 reductions in viral shedding rates had been sustained based on testing at 6 months after dosing, versus participants' baseline, and was even stronger than the 6-month reductions in viral shedding found in the Phase 1/2a trials (58% v. 40%).   In March 2016, the Company announced that it had collected viral

shedding data post-dosing, at 6 months and 12 months, and that the reductions in viral shedding for the Phase 2 study continued through testing at 12 months showed, "Sustained and consistent reductions in viral shedding rate at 50/60 µg and 60/75 µg doses," versus participants' baseline.

**The Phase 2(b) Trial**

53.     Each of the subjects in the Phase 1/2a and Phase 2 trials had been tested with versions of the proteins and adjuvants that had been manually formulated.  In anticipation of a much larger Phase 3 trial to be vetted, and the results approved by the FDA for marketing to the public, Genocea announced the commencement of a Phase 2b clinical trial using a modified formulation of GEN-003, including its adjuvant, to be manufactured using commercial processes.  Among other things, the Phase 2b study was intended to assure that the new formulation remained safe and effective.

54.     As described in a study description first posted to the National Institute of Health's ("NIH") website in August 2015, the study's primary outcome measure was to evaluate changes in viral shedding rates post-dosing, and that the reduction in viral shedding rates would then be measured again 6 months and 12 months after dosing, as a secondary outcome measure. The reduction in lesion rates was also listed as a secondary measure.

55.     The study was further described as a randomized double-blind, placebo-controlled clinical trial with an enrollment of 131 participants spread over two experimental GEN-003 groups, one testing the 60 µg/Matrix-M2 50 µg combination and one testing the 60 µg/Matrix-M2 75 µg combination, plus a placebo control group.  Each group contained about 45 subjects, and by 12 months after dosing about 30-32 study participants were still contributing shedding samples to Genocea.

56.     The Phase 2b post-dosing test results, as announced in September 2016, showed statistically significant reductions in both viral shedding and genital lesions, versus participants'

baseline.  As measured against the placebo control group, the 60/50 µg combination was shown to be statistically significant at the 5% confidence level, but the 60/75 µg combination was not – when using the Poisson method that had been modified to correct for the type 1 error identified when using the standard Poisson method.

57.     The Phase 2b 6-month test results for genital lesions, as publicly announced in January 2017, showed statistically significant reductions for the two GEN-003 dosing groups, both as against their baselines and the placebo control.  The Phase 2b 12-month test results for the reduction of genital lesions, as publicly announced in July 2017, showed statistically significant reductions for the GEN-003 dose group both against their baselines and the placebo control.

58.     To this day, Defendants have not publicly revealed the Phase 2b 6-month test results for viral shedding.  In July 2017, at the same time that the Company announced the 12-month Phase 2b test results for the reduction in lesion rates, it announced the 12-month Phase 2b test results for reductions in viral shedding.  The 12-month results showed that there was a 52% reduction in viral shedding rates *in the placebo group participants*, versus their baseline, which exceeded the rates of reduction for the active GEN-003 dose participants – meaning that at 12 months, the formula that Defendants had proposed to use for the Phase 3 testing was not shown to be effective in reducing viral shedding as compared to its control when using a reliable statistical method.  Because it is highly likely that the 6-month viral shedding test data was available in January 2017 (at the same time as the 6-month lesion test results were available), it may be strongly inferred that the 6-month viral shedding test results similarly did not support Genocea's claims that its Phase 2b testing showed that GEN-003 was effective in reducing viral shedding at 6 months after dosing.

59.     That Defendants had, and knew, the 6-month viral shedding Phase 2b test results, and that these results were inconsistent with Genocea's claims for GEN-003 efficacy, may be further inferred from internal staff meetings held in January 2017 and July 2017.

60.     As CW3 explained, in a January 2017 Company-wide meeting following the announcement of the purportedly positive Phase 2b 6-month test results (for genital lesions), Clark announced that there was "no interest" from potential funding partners in sponsoring the planned Phase 3 GEN-003 trials.  As CW3 noted, these trials would involve testing about 3,000 patients for safety and about 2,000 patients to evaluate the efficacy of GEN-003.   The discussions at the January 2017 Company-wide meeting left CW3 concerned for the stability of her job and she left the Company in February 2017.   Before she left she noted layoffs that immediately followed the meeting.  CW4, a former supply chain manager who was laid off in January 2017, recalled Clark then stating that the Company was going to focus more heavily on the oncology program.

61.     CW2 discussed a July 2017 internal "all hands" meeting, which she described as a "very bad day."  At that meeting, Clark announced the 12-month Phase 2b viral shedding data, and that the placebo group of patients had performed better.  Upon the announcement, there was an uproar and pointed questioning by scientists in the room, including about the 6-month results. According to CW3, one scientist, Scott Munzer, grilled Clark on the Phase 2b viral shedding data asking, "how that was even possible."  Clark stated that he did not have the answers and that Hetherington was better positioned to answer.  Hetherington responded that such results had happened in other trials and that he would be looking into it more.  CW3 observed that after that meeting the whole matter of the 12-month viral shedding data was "hush hush."

## MATERIAL FALSE AND MISLEADING STATEMENTS AND OMISSIONS

62.     Throughout the Class Period, and before, Defendants misled investors about the strength, reliability and consistency of its GEN-003 test results and the prospects for its commercialization.  As described by the CWs, and as strongly inferred from the timing and promises of Defendants to publish the 6-month viral shedding test results for the Phase 2b study, as of about January 2017, Defendants had received, but concealed, viral shedding test results that demonstrated that the efficacy of GEN-003 was, at best, marginal and its reliability suspect.  By falsely touting the strength and "consistency" of the GEN-003 test results, and hyping the multi-billion dollar market opportunity and prospects for commercialization, Defendants misled investors.  Defendants' failure to disclose the Phase 2b 6-month viral shedding test results, when they had a duty to do so, was also a material and misleading omission.

### The 3/31/16 Conference Call Discussing Phase 2 Test Results at 12 Months

63.     At a March 31, 2016 conference call with analysts, Defendants Clark and Hetherington discussed the 12-month test results for the Phase 2 GEN-003 study.  These results had been calculated using the standard Poisson method, even though the scientists at the University of Washington had, by that time, discovered and reported in a published workpaper the "type 1 error" associated with its use.  On the call, Hetherington reminded analysts that the placebo control group had only been monitored and tested through the 28-day period following the dose regimen, and that the primary endpoint of the Phase 2 trial had been to evaluate the impact of GEN-003 active doses on viral shedding as measured by the change in baseline. Hetherington apparently provided this background because, as described above, the Phase 2 post-dosing test results for the reduction of genital lesions had shown a higher reduction in the placebo group than with active doses of GEN-003.

64.     As described by Hetherington at the March 31, 2016 conference, "Viral shedding is the most objective and is a very efficient approach to demonstrate the antiviral activity of Gen-003, and particularly in a small trial and is therefore a perfect endpoint study for the purposes of efficiently identifying the best dose for late stage clinical trials."  Herrington also explained that, for the Phase 2 study, testing of viral shedding had been measured post-dosing, at 6 months after dosing and 12 months after dosing.

65.     As Hetherington pointed out, there were "two key findings" for the Phase 2 study. "First, as expected for the period during which we followed the placebo patients there was no change in viral shedding for those subjects.  Secondly, the doses for the greatest and most consistent reductions in viral shedding over time are the 60 micrograms of protein combined with either 50 micrograms or 75 micrograms of Matrix-M2 adjuvant."

66.     In response to a question by an analyst, as to why there seemed to be such volatility in the viral shedding test results at different doses and points in time, Clark responded as follows:

> That's true.  Yeah.  That's a very good question.  We've learned [an] awful lot about viral shedding measurements over time in patients being treated with GEN-003 and I think it applies broadly to the field.  Viral shedding is an episodic event, it's sporadic, it's not sustained, yet many of the episodes went misses [sic] because they are of short duration, so sampling is important and you have to strike the balance between frequency and duration of sampling with obviously, the logistics of collecting oral samples from patients, et cetera.
>
> I think, we found a good balance, we know that three patients per arm is sort of minimal to get at least an idea of the overall trends and 45 is clearly better.  And as we go up in our sample size, we'll get even smoother curves because the jumping around of an individual patient will get balanced out by the others in each of the dose groups.
>
> ***I think the key point Alan is that when you look at these curves, you have to look not at any given specific data point, but you have to look at all the data together, it's the totality of the picture that the curves are giving you that's important***.  So, what we see here is first of all, consistency with the ranking of

doses showing that the 60/50 and 60/75 are our best doses and the consistency from the prior trial to this trial showing that in fact, GEN-003 overall has shown a terrific amount of efficacy in reducing our [sic] sharing, consequently demonstrating its antiviral effect.  But I think we just have to understand the biology of this disease is that it is very episodic, it's unpredictable and you have to take that in account when you look at your data, that's why we do what we do. We look at multiple endpoints, we look at [it] in multiple ways, multiple analysis plans and we look at the overall picture of the data rather than getting focused on any one aberrant data point at any one time.

[Emphasis added].

67.     The statements about the statistical significance and strength of the Phase 2 viral shedding results were false and misleading given the unreliability of the test results, and the comments by Clark about the importance of having the "totality" of the viral shedding test results, in light of the inherent variability of herpes outbreaks, gives rise to a duty to disclose the rate of reduction in viral shedding for each time point of testing, including as measured against its placebo control, when statistical test results for GEN-003 studies were published.

**June 9, 2016 Press Release on Phase 2 Test Results**

68.     In a Genocea press release dated June 9, 2016, the following quote was attributed to Defendant Clark:

We are excited to highlight the data from our Phase 2 dose optimization trial evaluating GEN-003 for the treatment of genital herpes.  The ***statistically significant reductions in viral shedding and sustained efficacy 12 months after completion of dosing suggest GEN-003 could become a cornerstone therapy for patients suffering from genital herpes.***

[Emphasis added].

69.     The statements about the statistical significance and strength of the viral shedding test results and their importance for the prospects of GEN-003 therapy were false and misleading, as a result of the unreliability of the test results.

**August 4, 2016 Earnings Call**

70.    At an August 4, 2016 earnings call with analysts announcing Genocea's second

quarter 2016 financial results, which was attended by Defendants Clark, Poole, and

Hetherington, Clark described the significance of the 12-month Phase 2 test results, and

particularly, the importance of the statistically significant and consistent reductions in viral

shedding rates at the post-dosing, 6-month and 12-month testing points in time.   Clark also

described the Phase 2b study underway, explaining that the study was being performed using a

re-formulated version of GEN-003 that would be used in the much larger Phase 3 studies needed

to give FDA approval to publicly market the drug.   As he explained regarding the Phase 2b

study:   "***Given its [GEN-003] strong product profile, we view GEN-003 as a potential***

***cornerstone treatment for genital herpes with a greater than $1 billion revenue opportunity in***

***the U.S. alone***."   [Emphasis added].

71.    In response to an analyst question about past viral shedding test results,

Hetherington explained that what was most important was "consistency" of viral shedding test

results:

Q:    So I think in the prior trials, you've had a shedding reduction of about
        40% to 55% depending upon the dose.  How precise do you think those
        numbers are and how close do you think you need to be in terms of
        matching the same – on the dose level, the same shedding reduction to
        know that the Phase 3 production process is looking like the Phase 2
        production process?

A:    Yeah.  I think ***what gives us confidence that we have accurate numbers***
        ***on the biologic impact on shedding is the fact that we repeated these***
        ***results from the prior study.   So we are looking for consistent results.***
        ***That said, a few percentage points one way [or] the other is probably just***
        ***within the range of variability***.   How much we might actually see, we'll
        find out from the data.  But there is an opportunity that things could even
        look better than what we've seen in the past or something similar where
        it'll at least be reasonable and give us more confidence to move forward.
        That said, it's important to realize that the kinds of manufacturing changes
        we've made with this material are the type that we don't feel will

materially impact what we've seen.  ***So we expect to see similar kinds of reductions as in our prior two clinical trials***.

[Emphasis added].

72.    The statements about the accuracy, consistency, strength and statistical significance of the viral shedding test results were false and misleading, as a result of the unreliability of the test results.  These statements also highlight the importance of the disclosure of all the viral shedding test results when any test results are disclosed, and the duty to disclose them when discussing the quality and consistency of the GEN-003 test data, and the prospects of commercializing GEN-003.

### September 29, 2016 Disclosures About the Phase 2b Post-Dosing Results

73.    In a September 29, 2016 press release, Genocea announced that, "GEN-003 Demonstrates Significant Reduction of Viral Shedding in Phase 2b Clinical Trial."  The release went on to say:

> The study achieved its primary endpoint, with GEN-003 demonstrating a statistically significant reduction of 40 per cent in the rate of viral shedding in the 60 µg per protein/50 µg of Matrix-M2 dose group compared to both baseline and placebo.  ***The viral shedding rate reduction for this dose was consistent with its performance at the same time point in a prior Phase 2 trial***.

[Emphasis added].  The release then set out a chart of the test results:

| | 60 µg per protein / 50 µg of Matrix-M2 | 60 µg per protein / 75 µg of Matrix-M2 | Placebo |
|---|---|---|---|
| **Viral shedding rate reduction** | **-40%** | **-27%** | **+6%** |
| p-value vs. baseline | 0.03 | 0.16 | 0.76 |
| p-value vs. placebo | 0.05 | 0.20 | NA |

[Emphasis in original]. As a matter of statistics, the chart shows that, in fact, the interim viral shedding results for the 60/75 µg active dose was ***not*** statistically significant, either when measured against the participants' baseline or the placebo control.

74.    The release noted that the statistical results were achieved using a "modified Poisson model (refined since Phase 2a trial with reference to advances in the field: Margaret

Amalia, 'Models for HSV shedding must account for two levels of over dispersion' (January 2016)."   As such, the test results achieved and measured in the Phase 2 study were not comparable or "consistent" with the Phase 2b results.

75.     In the earnings call held the same day, Hetherington commented that the GEN-003 viral shedding rate reductions were "statistically significant versus baseline with a p-value of 0.03; and when compared to placebo, it has a p-value of 0.05. ***Importantly, the results are consistent with the statistically significant 41% reduction that we observed for this dose group in the prior Phase 2 trial, this gives us great confidence that this effect is robust and replicable.***"   [Emphasis added].   These statements were false and misleading as described above.

### November 3, 2016 Phase 2b Update

76.     In a November 3, 2016 earnings call, Defendants provided an update on the release of further test results for the Phase 2b study.   Defendant Clark advised that "[w]e expect to announce the first placebo-controlled clinical efficacy data from this trial in January against a variety of end points, looking at efficacy over the first six months after dosing," and that ***"[w]e anticipate the viral shedding and immunology data at six months post-doing from this trial will follow later in the first half of 2017 as we complete sample processing***," and noted that they remain on track for their "end of Phase 2 meeting" with the FDA in first quarter of 2017. [Emphasis added].   No explanation, however, was given as to why release of the 6-month viral shedding test results would not be available for release on the same timetable as the data on the reduction of genital lesions – as had been the case in the Phase 2 trial.

### The December 14, 2016 R&D Day GEN-003 Presentation

77.     On December 14, 2016, the Company issued a press release announcing its "R&D Day" highlighting its lead GEN-003 program, and that the "GEN-003 Phase 2b placebo-controlled efficacy data six months after dosing expected in January 2017."   The slides presented

by Defendant Hetherington were titled, "The Power of GEN-003 to Revolutionize Herpes Treatment." Among other things, the slides for the December 14, 2016 R&D presentation reported that the prior "placebo effect" that had been observed in Phase 2 in connection with the post-dosing test results for the reduction of genital lesions had been an "artifact" of the study design and had been "corrected" for the Phase 2b Study. Another slide reminded investors that the Phase 2b "primary endpoint" was, the "reduction in viral shedding rate."

### The January 5, 2017 Phase 2b Disclosures of Only Selective 6-Month Test Results

78.     On January 5, 2017, Genocea announced "*Positive 6-Month Results from GEN-003 Phase 2b Clinical Trial – Trial meets statistical significance vs. placebo for multiple clinical endpoints through six months*." [Emphasis added]. The release quoted Defendant Clark as stating, "*We are very pleased to have demonstrated such a powerful impact on genital herpes clinical disease in this trial, supporting the groundbreaking potential of GEN-003 to be the first-ever therapeutic vaccine for a chronic infection*, and the first advance in the treatment of genital herpes in more than 20 years." [Emphasis added]. The release was silent about the 6-month viral shedding test results, even though Defendants' statements were materially misleading through the omission of these results.

79.     In slides accompanying Genocea's January 5, 2017 conference call with analysts, the Company proclaimed "*Successful Phase 2b Clinical Results – Advancing Potential Blockbuster to Phase 3*." [Emphasis added]. Under this heading, the Company listed as bullet points:

- *Statistically significant improvements in clinical disease versus placebo across multiple endpoints 6 months post-dosing*;

- *Compelling profile cemented across three clinical studies*
  - Durable impact on clinical disease
  - *Significant reduction in viral shedding*

- Large unmet patient need in a disease of epidemic proportions
  - *Potential ~$2 billion global revenue opportunity*

[Emphasis added].

80.    In another January 5, 2017 slide, the Company announced, "GEN-003: *Phase 3 –*

*Ready Program with Blockbuster Potential*."   [Emphasis added].

81.    Nowhere in the January 5, 2017 presentation did the Company disclose the 6-

month test results for viral shedding, even though Defendants' statements were materially

misleading through the omission of these results.

## The SEC Filings Made February 16 and 17, 2017

82.    In Exhibit 99.1 to a Form 8-K filed February 16, 2017 and signed by Defendant

Poole, the Company set out its "Anticipated Upcoming Milestones and Events."   Among the

listed "milestones" was the bullet, "*2H 2017: GEN-003 12-month Phase 2b data anticipated;*

*expected to reconfirm clinical profile of GEN-003 at 1 year post dosing*."   [Emphasis added].

83.    The Company's Form 10-K for fiscal year ended December 31, 2016 was filed

February 17, 2017.   In its Management Discussion and Analysis section, it discussed the test

results for the Phase 1/2 trial, Phase 2 trial, and Phase 2b trial.   Included in the description for the

Phase 2b trial was the viral shedding post-dosing data that had been reported in September 2016,

and the selectively announced 6-month test data limited to the reduction of genital lesions as

reported on January 5, 2017.   The Form 10-K stated:

> In September 2016, we announced positive viral shedding rate reductions from
> the ongoing Phase 2b study.   *The study achieved its primary endpoint, with*
> *GEN-003 demonstrating a statistically significant (versus placebo and baseline)*
> *40% reduction in the viral shedding rate compared to baseline immediately*
> *after dosing* in the 60/50 Dose group, using a new Phase 3-ready formulation.
> The result was consistent with a statistically significant (versus placebo and
> baseline) viral shedding rate reduction of 41% at this same dose and time point in
> a prior Phase 2 trial . . . . *In January 2017, we announced positive clinical*
> *results from this ongoing trial.   At six months after dosing, GEN-003*

**demonstrated statistically significant improvements versus placebo across multiple clinical endpoints.**

[Emphasis added].

84.     The Form 10-K also included the following statement:

The clinical efficacy data versus placebo at twelve-months post dosing is expected in the middle of 2017. ***The viral shedding rate reduction data at six-months post dosing is expected in the first half of 2017.***

[Emphasis added].  The Form 10-K was signed by, *inter alia*, Clark and Poole.  The statements

reporting only selective and stale results, and the statements regarding Defendants'

"expectations" were misleading, in light of the availability of the concealed and omitted 6-month

testing results for the reduction of viral shedding.

### The May 5, 2017 1Q2017 Form 10-Q

85.     On May 5, 2017, Genocea filed its Form 10-Q for the period ending March 31,

2017 (the "1Q2017 10-Q"), signed by Defendants Poole and Clark.  In the 1Q2017 10-Q, the

Company stated, in part:

The Company expects that existing cash, cash equivalents and investments are sufficient to support operating expenses, capital expenditure requirements, and debt obligations into the first quarter of 2018, without assuming any receipt of proceeds from potential business development partnerships or equity financings. This guidance assumes the Company commences a Phase 3 clinical trial for GEN-003 for genital herpes around the end of 2017 . . . ; however, ***it is the Company's strategy to secure additional sources of financing in advance of starting GEN-003 Phase 3 clinical trials***.

…

***In January 2017, we announced further positive clinical results from the ongoing Phase 2b clinical trial***.

…

Around the end of the first quarter of 2017, we had a successful end-of-Phase 2 meeting with the FDA, the outcome of which was aligned with our previously disclosed Phase 3 design expectations. ***We continue to expect that GEN-003 will be Phase 3-ready in the fourth quarter of 2017***.

[Emphasis added].

86.     For its Phase 2b trial, the Company, again, also described the September 2016 "***positive viral shedding rate reductions from the ongoing Phase 2b study***" [emphasis added], again noting that this result was "consistent with a statistically significant (versus placebo and baseline) viral shedding rate reduction of 41% at this same dose and time point in a prior Phase 2 clinical trial." Again, the Company reported the lesion rate reductions from the 6-month testing data announced in January 2017. The Form 10-Q was silent with respect to the 6-month test results for the reduction in viral shedding, and as to when those results would be published, even though Defendants' statements were materially misleading through the omission of these results.

### The July 24, 2017 Phase 2b Disclosures of 12-Month Test Results

87.     On July 24, 2017, the Company issued a press release announcing, "***Genocea Reports Positive Top-Line 12-Month Phase 2b Data for GEN-003 in Genital Herpes***." [Emphasis added]. In the press release, the Company stated, in part:

> In this 131-subject Phase 2b clinical trial, GEN-003 reduced the median genital lesion rate (or percent days with genital lesions) versus placebo by 49 percent (p=0.01) over the 12 months' post dosing at the 60 μg per antigen / 50 μg of adjuvant dose. Importantly, these results were achieved at the Phase 3 dose and expected Phase 3 primary endpoint. Other clinical endpoints for this dose improved or were consistent with previously reported positive data. No changes were observed to the previously established safety profile of GEN-003.

88.     While the release hyped the 12-month results as further supporting the efficacy and prospects of GEN-003, embedded in the chart of 12-month study test results was that viral shedding was reduced 52% ***in the placebo group***, a greater reduction than either of the GEN-003 dosing cohorts:

**Summary of Reported 12 Month Data**

| Endpoint | 60/50 (n=43) | 60/75 (n=44) | Placebo (n=44) |
|---|---|---|---|
| Number of subjects contributing clinical data | 43 | 44 | 44 |
| **Median genital lesion rate (percent of days with lesions over 12 months)** | **2.3%** | **2.8%** | **4.5%** |
| Percent reduction versus placebo | -49% | -37% | NA |
| p-value versus placebo[1] | 0.01 | NS | NA |
| **Median number of recurrences over 12 months** | **1.5** | **2.0** | **4.0** |
| Percent reduction versus placebo | -63% | -50% | NA |
| p-value versus placebo[1] | 0.01 | NS | NA |
| **Median duration of recurrences (days)** | **2.7** | **4.0** | **3.6** |
| Percent reduction versus placebo | -25% | 11% | NA |
| p-value versus placebo[1] | 0.02 | NS | NA |
| **Kaplan-Meier estimate of percent recurrence free after first dose** | **20%** | **16%** | **7%** |
| p-value versus placebo[2] | 0.04 | NS | NA |
| **Kaplan-Meier estimate of percent recurrence free after last dose** | **20%** | **17%** | **8%** |
| p-value versus placebo[2] | NS | 0.05 | NA |
| Number of subjects contributing shedding data | 30 | 32 | 31 |
| **Viral shedding rate reduction from baseline** | **-42%** | **-39%** | **-52%** |
| p-value versus baseline[3] | 0.02 | NS | 0.03 |
| p-value versus placebo[3] | NS | NS | NA |

Footnotes to the chart defined "NS" as referring to a "p-value" of "more than 0.05," meaning that the reduction in viral shedding in the dosing groups was not statistically significant, as measured against the placebo control group.  The chart also showed that the 12-month data for the 60/75 µg cohort did not show statistical significance against its baseline.  The press release did not contain the viral shedding test data as of 6 months after dosing, even though Defendants had a duty to disclose them and the omission of those results caused the release to be materially misleading.

89.     Slides distributed for use at the July 24, 2017 analyst call were titled, "***GEN-003 Positive Phase 2b Clinical Efficacy Results***."  The chart of data containing the viral shedding test results, including the 52% rate reduction in the placebo, was titled, "***Consistent, Positive Data from Secondary Clinical Endpoints at 60/50 Dose***."  Other slides announced, "***GEN-003***

***Phase 3 on Track to Start by End of 2017***"; and "***GEN-003 Strongly Positioned Ahead of***

***Phase 3***," with a footnote noting "Subject to obtaining capital."  [Emphasis added].

90.    A conference call held that same day to discuss the Phase 2b clinical trial results

was attended by Clark and Hetherington.  Clark began the call stating:

> ***I am delighted to be sharing the most important readout from our Phase 2b trial
> and maybe the most important data in Genocea's history as we look ahead to
> Phase 3***.

[Emphasis added].  Hetherington, in turning to the slide on the reduction of lesions, versus the

baseline and placebo control group, stated:

> ***We are really thrilled with these results***, because as you can see here compared to
> placebo recipients, subjects randomized to GEN-003 at the 60/50 dose had a
> statistically significant 49% lower lesion rate over the 12-month period after
> dosing. . . . ***I'll remind you that this result is highly consistent with the
> statistically significant 52% reduction versus placebo that we saw at the six-
> month post dosing time point***.

[Emphasis added].

91.    In hyping the positive results in the reduction of lesion rates, including as

compared to the placebo group, and omitting the 6-month test results for viral shedding,

Defendants created a misleading portrayal of the efficacy of GEN-003.  This was compounded

by the following statements by Hetherington in downplaying the placebo effect seen in the 12-

month viral shedding rate:

> ***We know that GEN-003 works by reducing viral shedding and believe that
> variability in shedding data is a consequence of the sporadic nature of shedding
> in the small number of subjects provided data at this time point.  We do not
> expect that this will be a factor in Phase 3 studies, given the much larger
> sample size.***

[Emphasis added].

**The August 9, 2017 2Q2017 Form 10-Q**

92.     The second quarter 2017 Form 10-Q, filed August 9, 2017 and signed by

Defendants Poole and Clark, stated, in part:

> In July 2017, we announced positive clinical results from the Phase 2b trial.  At
> twelve months after dosing, GEN-003 demonstrated statistically significant
> improvements versus placebo in both the median genital lesion rate and across
> multiple clinical endpoints. Importantly, these results were achieved at the Phase
> 3 dose and expected Phase 3 primary endpoint.
>
> …
>
> In our planned Phase 3 trial, we expect to have a much larger sample size from
> the hundreds of patients from whom we plan to collect viral shedding samples,
> and we believe that this larger sample size may lead to greater differentiation in
> viral shedding in GEN-003 subjects versus placebo.

93.     By the statements quoted above, Defendants provided a misleading portrayal of

the strength, reliability and consistency of the test results for GEN-003, and its prospects for

commercialization.   By emphasizing the importance of the viral shedding test results in

demonstrating the efficacy of GEN-003, the importance of the "consistency" of the positive test

results, and by providing stale viral shedding test results, and partial 6-month data on the

reductions in the lesion rates, Defendants assumed the duty of disclosing the Phase 2b 6-month

viral shedding test results.  This duty also arose as a result of Defendants' repeated statements of

their "expectations" with respect to these test results.

94.     As the statements of the CWs demonstrate, the efficacy of GEN-003 was

marginal, at best, and the prospect of finding a large pharmaceutical company to invest the

enormous sums required to perform testing on thousands of study participants, as required to

obtain FDA approval, was known to be unlikely – particularly by January 2017, when the 6-

month viral shedding data became available.  Unlike investors and analysts, who may not have

had the scientific sophistication to see through Defendants' misleading portrayals of the GEN-

003 test results, scientists at a large pharmaceutical company would have known to demand and examine the 6-month Phase 2b viral shedding data, and would have realized that the Phase 2b viral shedding data was weak, unreliable and inconsistent, and did not warrant a huge financial investment – estimated by research analysts at Cowen and Company LLC ("Cowen") to be approximately $150 million.   In addition to following Genocea's stock and issuing research reports, Cowen served as Genocea's bookrunner for its stock sales.   Indeed, the comments made by Clark at the January 2017 internal company meeting – and the layoffs that immediately followed – demonstrate that by this time, Defendants no longer believed that GEN-003 offered the "blockbuster" opportunity they touted.

## THE TRUTH EMERGES

95.    On September 25, 2017, after the market closed, Genocea issued a press release entitled, "Genocea Announces Strategic Shift to Immuno-oncology and the Development of Neoantigen Cancer Vaccines."   In the press release, the Company stated, in part, that "it is *exploring strategic alternatives for GEN-003*, its Phase 3-ready investigational immunotherapy for the treatment of genital herpes. Consequently, Genocea is *ceasing GEN-003 spending and activities and is reducing its workforce by approximately 40 percent*."   [Emphasis added].

96.    On this news, the Company's share price *fell $4.08*, or 76.5%, *to close at $1.25* on September 26, 2017.

97.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and the other Class members have suffered significant losses and damages.

## ADDITIONAL FACTS SHOWING SCIENTER

98.    Defendant Poole's suspiciously timed stock sales add to the already strong showing of scienter in this action.   He was motivated to engage in the fraudulent scheme alleged

herein and to issue materially false and misleading statements and/or omit material facts in order to inflate Genocea's common stock price and maximize his individual profits through insider trading.   Defendant Poole's trading patterns before, during, and after the Class Period demonstrate that his trades were anything, but routine.

99.   As detailed below, Defendant Poole did not engage in a single sale of Genocea securities prior to the start of the Class Period, yet made two swift sales dumping approximately *25%* of his common stock and *76%* of stock acquired upon exercising his stock options.   These trades correlated with market moving events or dates in which Defendant Poole was in possession of material non-public information.   Further, these sales occurred just months before the truth was revealed to the market.   Once revealed, Defendant Poole did not engage in a single additional sale thereafter.

100.   Specifically, from the time he joined Genocea in April 2014 to the start of the Class Period on March 31, 2016, Defendant Poole accumulated 430,726 shares in stock option awards and 4,213 shares of common stock.   During this same period, Poole let his options and common stock accumulate without a single sale.

101.   On May 8, 2017, Defendant Poole sold 6,213 shares of Genocea common stock, or 25% of his then-vested holdings, for $6.51 per share, amounting to $40,446.63 in proceeds.

102.   On July 24, 2017, the same day that the 12-month test results for the Phase 2b study were announced, Poole exercised options and sold 45,000 shares for $6.00 per share, generating $270,000 in proceeds and a $130,950 profit.   These shares comprised the entirety of Poole's vested and exercisable stock options under his February 2, 2016 options award.   This also comprised a whopping *76%* of Defendant Poole's stock from his exercisable options at that time.   Poole was listed as the Company contact for investors having questions about the

misleading July 24, 2017 slides presented at the analyst call, and signed the Form 8-K that attached those slides, as well as the misleading July 24, 2017 press release, for filing with the SEC.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

103.    Plaintiffs brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Genocea stock during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

104.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Genocea securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

105.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

106.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interest, antagonism, or conflict with the members of the Class.

107.     Common questions of law and fact exist, as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Genocea;

    c.    whether the Individual Defendants caused Genocea to issue false and misleading financial statements during the Class Period;

    d.    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    e.    whether the prices of Genocea stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

    f.    whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

108.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

109.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   Genocea stock was traded in an efficient market;

d.   the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.   the Company traded on the NASDAQ and was covered by multiple analysts;

f.   the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Genocea stock; and

g.   Plaintiffs and members of the Class purchased, acquired, and/or sold Genocea stock between the time Defendants failed to disclose, or misrepresented material facts, and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

110.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

111.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

112.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

113.   This Count is asserted against Defendants and is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

114.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Genocea stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Genocea stock at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and Individual Defendants, took the actions set forth herein.

115.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated, directly or indirectly, in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Genocea stock.   Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Genocea's finances and business prospects.

116.    By virtue of their positions at Genocea, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs, and the other members of the Class, or, in the alternative,

Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts, as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted, as described above.

117.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Genocea, the Individual Defendants had knowledge of the details of Genocea's internal affairs.

118.    The Individual Defendants are liable, both directly and indirectly, for the wrongs complained of herein.  Because of the nature of their positions and duties, and their control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of Genocea.  As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Genocea's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Genocea stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Genocea's business and financial condition, which were concealed by Defendants, Plaintiffs and the other members of the Class purchased, or otherwise acquired, Genocea stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market, and/or upon statements disseminated by Defendants and were damaged thereby.

119.    During the Class Period, Genocea stock was traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Genocea stock at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased, or otherwise acquired, said stock, or would not have purchased, or otherwise acquired, them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Genocea stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Genocea stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

120.    By reason of the conduct alleged herein, Defendants, knowingly or recklessly, directly or indirectly, have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of Genocea stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of §20 of the Exchange Act Against the Individual Defendants**

122.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

123.    During the Class Period, the Individual Defendants participated in the operation and management of Genocea and conducted and participated, directly and indirectly, in the conduct of Genocea's business affairs.   Because of their senior positions, the Individual Defendants knew the adverse non-public information alleged herein.

124.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, with respect to Genocea's financial condition and operations, and to correct promptly any public statements issued by Genocea, which had become materially false or misleading.

125.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings, which Genocea disseminated in the marketplace during the Class Period concerning Genocea's results of operations.   They also participated in, and had control over, false and misleading statements and omissions made during conference calls with analysts. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Genocea to engage in the wrongful acts complained of herein.   The Individual Defendants therefore, were "controlling persons" of Genocea within the meaning of §20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Genocea stock.

126.    Each of the Individual Defendants, therefore, acted as a controlling person of Genocea.   By reason of their senior management positions and/or being directors of Genocea, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Genocea to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of Genocea and possessed

the power to control the specific activities, which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

127.    By reason of the above conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations committed by Genocea.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring that the instant action may be maintained as a class action under Fed. R. Civ. P. 23  and certifying Plaintiffs as the Class Representatives;

B.    Awarding Plaintiffs and the other members of the Class compensatory damages;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D.    Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  March 29, 2018              **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda F. Lawrence
Amanda F. Lawrence (BBO# 568737)
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
Email:  alawrence@scott-scott.com

Thomas L. Laughlin IV
Rhiana L. Swartz
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
Email: tlaughlin@scott-scott.com
         rswartz@scott-scott.com

Shannon L. Hopkins (BBO# 657485)
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: 203-992-4523
Facsimile:  212-363-7500
shopkins@zlk.com

*Co-Lead Counsel for Lead Plaintiffs*

Jason M. Leviton (BBO# 678331)
**BLOCK & LEVITON, LLP**
155 Federal Street, Suite 400
Boston, MA 02110
Telephone: 617-398-5600
Facsimile:  617-507-6020
Email: jason@blockesq.com

*Local Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on March 29, 2018.

/s/ Amanda F. Lawrence
Amanda F. Lawrence (BBO# 568737)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  860-537-5537
Facsimile:  860-537-4432
Email:  alawrence@scott-scott.com

*Co-Lead Counsel for Lead Plaintiffs*